# Exhibit B

▮

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. |
| | * | |
| v. | * | (18 U.S.C. §§ 2, 371, 981(a)(1)(C), 982, |
| | * | 1001(a), 1956(h), and 3551 et seq.; 22 |
| PAUL J. MANAFORT, JR. and | * | U.S.C. §§ 612(a), 618(a)(1), and |
| RICHARD W. GATES III, | * | 618(a)(2); 28 U.S.C. § 2461(c); 31 U.S.C. |
| | * | §§ 5314 and 5322(b)) |
| Defendants. | * | |
| | ******* | |

## INDICTMENT

The Grand Jury for the District of Columbia charges:

Case: 1:17–cr–00201
Assigned To : Judge Jackson, Amy Berman
Assign. Date : 10/27/2017
Description: INDICTMENT (B)

**Introduction**

At all times relevant to this Indictment:

1.      Defendants PAUL J. MANAFORT, JR., (MANAFORT) and RICHARD W. GATES III

(GATES) served for years as political consultants and lobbyists. Between at least 2006 and 2015,

MANAFORT and GATES acted as unregistered agents of the Government of Ukraine, the Party

of Regions (a Ukrainian political party whose leader Victor Yanukovych was President from 2010

to 2014), Yanukovych, and the Opposition Bloc (a successor to the Party of Regions that formed

in 2014 when Yanukovych fled to Russia). MANAFORT and GATES generated tens of millions

of dollars in income as a result of their Ukraine work. In order to hide Ukraine payments from

United States authorities, from approximately 2006 through at least 2016, MANAFORT and

GATES laundered the money through scores of United States and foreign corporations,

partnerships, and bank accounts.

1

2.     In furtherance of the scheme, MANAFORT and GATES funneled millions of dollars in payments into foreign nominee companies and bank accounts, opened by them and their accomplices in nominee names and in various foreign countries, including Cyprus, Saint Vincent & the Grenadines (Grenadines), and the Seychelles. MANAFORT and GATES hid the existence of the foreign companies and bank accounts, falsely and repeatedly reporting to their tax preparers and to the United States that they had no foreign bank accounts.

3.     In furtherance of the scheme, MANAFORT and GATES concealed from the United States their work as agents of, and millions of dollars in payments from, Ukraine and its political parties and leaders. Because MANAFORT and GATES, among other things, directed a campaign to lobby United States officials on behalf of the Government of Ukraine, the President of Ukraine, and Ukrainian political parties, they were required by law to report to the United States their work and fees. MANAFORT and GATES did not do so. Instead, when the Department of Justice sent inquiries to MANAFORT and GATES in 2016 about their activities, MANAFORT and GATES responded with a series of false and misleading statements.

4.     In furtherance of the scheme, MANAFORT used his hidden overseas wealth to enjoy a lavish lifestyle in the United States, without paying taxes on that income. MANAFORT, without reporting the income to his tax preparer or the United States, spent millions of dollars on luxury goods and services for himself and his extended family through payments wired from offshore nominee accounts to United States vendors. MANAFORT also used these offshore accounts to purchase multi-million dollar properties in the United States. MANAFORT then borrowed millions of dollars in loans using these properties as collateral, thereby obtaining cash in the United States without reporting and paying taxes on the income. In order to increase the amount of money he could access in the United States, MANAFORT defrauded the institutions that loaned money

2

on these properties so that they would lend him more money at more favorable rates than he would otherwise be able to obtain.

5.   GATES aided MANAFORT in obtaining money from these offshore accounts, which he was instrumental in opening.   Like MANAFORT, GATES used money from these offshore accounts to pay for his personal expenses, including his mortgage, children's tuition, and interior decorating of his Virginia residence.

6.   In total, more than $75,000,000 flowed through the offshore accounts.   MANAFORT laundered more than $18,000,000, which was used by him to buy property, goods, and services in the United States, income that he concealed from the United States Treasury, the Department of Justice, and others.   GATES transferred more than $3,000,000 from the offshore accounts to other accounts that he controlled.

### Relevant Individuals And Entities

7.   MANAFORT was a United States citizen.   He resided in homes in Virginia, Florida, and Long Island, New York.

8.   GATES was a United States citizen.   He resided in Virginia.

9.   In 2005, MANAFORT and another partner created Davis Manafort Partners, Inc. (DMP) to engage principally in political consulting.   DMP had staff in the United States, Ukraine, and Russia.   In 2011, MANAFORT created DMP International, LLC (DMI) to engage in work for foreign clients, in particular political consulting, lobbying, and public relations for the Government of Ukraine, the Party of Regions, and members of the Party of Regions.   DMI was a partnership solely owned by MANAFORT and his spouse.   GATES worked for both DMP and DMI and served as MANAFORT's right-hand man.

10.   The Party of Regions was a pro-Russia political party in Ukraine.   Beginning in

3

approximately 2006, it retained MANAFORT, through DMP and then DMI, to advance its interests in Ukraine, including the election of its slate of candidates. In 2010, its candidate for President, Yanukovych, was elected President of Ukraine. In 2014, Yanukovych fled Ukraine for Russia in the wake of popular protests of widespread governmental corruption. Yanukovych, the Party of Regions, and the Government of Ukraine were MANAFORT, DMP, and DMI clients.

11.     The European Centre for a Modern Ukraine (the Centre) was created in or about 2012 in Belgium as a mouthpiece for Yanukovych and the Party of Regions. The Centre was used by MANAFORT, GATES, and others in order to lobby and conduct a public relations campaign in the United States and Europe on behalf of the existing Ukraine regime. The Centre effectively ceased to operate upon the downfall of Yanukovych in 2014.

12.     MANAFORT and GATES owned or controlled the following entities, which were used in the scheme (the MANAFORT-GATES entities):

### Domestic Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Bade LLC (RG) | January 2012 | Delaware |
| Daisy Manafort, LLC (PM) | August 2008 | Virginia |
| | March 2011 | Florida |
| Davis Manafort International LLC (PM) | March 2007 | Delaware |
| DMP (PM) | March 2005 | Virginia |
| | March 2011 | Florida |
| Davis Manafort, Inc. (PM) | October 1999 | Delaware |
| | November 1999 | Virginia |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| DMI  (PM) | June 2011 | Delaware |
| | March 2012 | Florida |
| Global Sites LLC (PM, RG) | July 2008 | Delaware |
| Jemina LLC (RG) | July 2008 | Delaware |
| Jesand Investment Corporation (PM) | April 2002 | Virginia |
| Jesand Investments Corporation (PM) | March 2011 | Florida |
| John Hannah, LLC (PM) | April 2006 | Virginia |
| | March 2011 | Florida |
| Jupiter Holdings Management, LLC (RG) | January 2011 | Delaware |
| Lilred, LLC (PM) | December 2011 | Florida |
| LOAV Ltd. (PM) | April 1992 | Delaware |
| MC Brooklyn Holdings, LLC (PM) | November 2012 | New York |
| MC Soho Holdings, LLC (PM) | January 2012 | Florida |
| | April 2012 | New York |
| Smythson LLC (also known as Symthson LLC) (PM, RG) | July 2008 | Delaware |

Cypriot Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Actinet Trading Limited (PM, RG) | May 2009 | Cyprus |
| Black Sea View Limited (PM, RG) | August 2007 | Cyprus |

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Bletilla Ventures Limited (PM, RG) | October 2010 | Cyprus |
| Cavenari Investments Limited (RG) | December 2007 | Cyprus |
| Global Highway Limited (PM, RG) | August 2007 | Cyprus |
| Leviathan Advisors Limited (PM, RG) | August 2007 | Cyprus |
| LOAV Advisors Limited (PM, RG) | August 2007 | Cyprus |
| Lucicle Consultants Limited (PM, RG) | December 2008 | Cyprus |
| Marziola Holdings Limited (PM) | March 2012 | Cyprus |
| Olivenia Trading Limited (PM, RG) | March 2012 | Cyprus |
| Peranova Holdings Limited (PM, RG) | June 2007 | Cyprus |
| Serangon Holdings Limited (PM, RG) | January 2008 | Cyprus |

Other Foreign Entities

| Entity Name | Date Created | Incorporation Location |
|---|---|---|
| Global Endeavour Inc. (also known as Global Endeavor Inc.) (PM) | Unknown | Grenadines |
| Jeunet Ltd. (PM) | August 2011 | Grenadines |
| Pompolo Limited (RG) | April 2013 | United Kingdom |

13.    The Internal Revenue Service (IRS) was a bureau in the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the Treasury.

**The Scheme**

14.     Between in or around 2008 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, MANAFORT and GATES devised and intended to devise, and executed and attempted to execute, a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises from the United States, banks, and other financial institutions.  As part of the scheme, MANAFORT and GATES repeatedly provided false information to financial bookkeepers, tax accountants, and legal counsel, among others.

MANAFORT And GATES' Wiring Of Money From Offshore Accounts Into The United States

15.     In order to use the money in the offshore nominee accounts of the MANAFORT-GATES entities without paying taxes on it, MANAFORT and GATES caused millions of dollars in wire transfers from these accounts to be made for goods, services, and real estate.  They did not report these transfers as income to DMP, DMI, or MANAFORT.

16.     From 2008 to 2014, MANAFORT caused the following wires, totaling over $12,000,000, to be sent to the vendors listed below for personal items.  MANAFORT did not pay taxes on this income, which was used to make the purchases.

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| **Vendor A** (Home Improvement Company in the Hamptons, New York) | 6/10/2008 | LOAV Advisors Limited | Cyprus | $107,000 |
| | 6/25/2008 | LOAV Advisors Limited | Cyprus | $23,500 |
| | 7/7/2008 | LOAV Advisors Limited | Cyprus | $20,000 |
| | 8/5/2008 | Yiakora Ventures Limited | Cyprus | $59,000 |
| | 9/2/2008 | Yiakora Ventures Limited | Cyprus | $272,000 |
| | 10/6/2008 | Yiakora Ventures Limited | Cyprus | $109,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 10/24/2008 | Yiakora Ventures Limited | Cyprus | $107,800 |
| | 11/20/2008 | Yiakora Ventures Limited | Cyprus | $77,400 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $100,000 |
| | 1/14/2009 | Yiakora Ventures Limited | Cyprus | $9,250 |
| | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $97,670 |
| | 2/25/2009 | Yiakora Ventures Limited | Cyprus | $108,100 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $94,394 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $54,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $9,550 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $86,650 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $34,400 |
| | 7/31/2009 | Yiakora Ventures Limited | Cyprus | $106,000 |
| | 8/28/2009 | Yiakora Ventures Limited | Cyprus | $37,000 |
| | 9/23/2009 | Yiakora Ventures Limited | Cyprus | $203,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $38,800 |
| | 11/18/2009 | Global Highway Limited | Cyprus | $130,906 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $124,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $25,000 |
| | 7/8/2010 | Global Highway Limited | Cyprus | $28,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $26,500 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $138,900 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $31,500 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $67,600 |
| | 10/14/2010 | Yiakora Ventures Limited | Cyprus | $107,600 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $31,500 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $46,160 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $36,500 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $26,800 |
| | 4/4/2011 | Leviathan Advisors Limited | Cyprus | $195,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $95,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $6,500 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $70,000 |
| | 6/27/2011 | Leviathan Advisors Limited | Cyprus | $39,900 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $95,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $22,000 |
| | 10/25/2011 | Global Highway Limited | Cyprus | $9,300 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $74,000 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $22,300 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 11/29/2011 | Global Highway Limited | Cyprus | $6,100 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $17,800 |
| | 1/17/2012 | Global Highway Limited | Cyprus | $29,800 |
| | 1/20/2012 | Global Highway Limited | Cyprus | $42,600 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 2/23/2012 | Global Highway Limited | Cyprus | $75,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $22,300 |
| | 3/28/2012 | Peranova Holdings Limited | Cyprus | $37,500 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $50,000 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $79,000 |
| | 6/5/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $11,860 |
| | 7/9/2012 | Lucicle Consultants Limited | Cyprus | $10,800 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $88,000 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $48,800 |
| | 9/27/2012 | Lucicle Consultants Limited | Cyprus | $100,000 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $298,000 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $55,000 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $149,000 |
| | 3/12/2013 | Lucicle Consultants Limited | Cyprus | $375,000 |
| | 8/29/2013 | Global Endeavour Inc. | Grenadines | $200,000 |
| | 11/13/2013 | Global Endeavour Inc. | Grenadines | $75,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $80,000 |
| | 12/6/2013 | Global Endeavour Inc. | Grenadines | $130,000 |
| | 12/12/2013 | Global Endeavour Inc. | Grenadines | $90,000 |
| | 4/22/2014 | *Unknown* | *Unknown* | $56,293 |
| | 8/18/2014 | Global Endeavour Inc. | Grenadines | $34,660 |
| | | | **Vendor A Total** | **$5,434,793** |
| **Vendor B** (Home Automation, Lighting and Home Entertainment Company in Florida) | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 5/16/2011 | Leviathan Advisors Limited | Cyprus | $25,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $17,006 |
| | 11/23/2011 | Global Highway Limited | Cyprus | $11,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $6,200 |
| | 10/31/2012 | Lucicle Consultants Limited | Cyprus | $290,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $160,600 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $194,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 1/24/2013 | Lucicle Consultants Limited | Cyprus | $6,300 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $51,600 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $260,000 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $175,575 |
| | 11/5/2013 | Global Endeavour Inc. | Grenadines | $73,000 |
| | | | **Vendor B Total** | **$1,319,281** |
| Vendor C (Antique Rug Store in Alexandria, Virginia) | 10/7/2008 | Yiakora Ventures Limited | Cyprus | $15,750 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $46,200 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $7,400 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $65,000 |
| | 5/7/2009 | Yiakora Ventures Limited | Cyprus | $210,000 |
| | 7/15/2009 | Yiakora Ventures Limited | Cyprus | $200,000 |
| | 3/31/2010 | Yiakora Ventures Limited | Cyprus | $140,000 |
| | 6/16/2010 | Global Highway Limited | Cyprus | $250,000 |
| | | | **Vendor C Total** | **$934,350** |
| Vendor D (Related to Vendor C) | 2/28/2012 | Global Highway Limited | Cyprus | $100,000 |
| | | | **Vendor D Total** | **$100,000** |
| Vendor E (Men's Clothing Store in New York) | 11/7/2008 | Yiakora Ventures Limited | Cyprus | $32,000 |
| | 2/5/2009 | Yiakora Ventures Limited | Cyprus | $22,750 |
| | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $13,500 |
| | 10/26/2009 | Yiakora Ventures Limited | Cyprus | $32,500 |
| | 3/30/2010 | Yiakora Ventures Limited | Cyprus | $15,000 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $39,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 8/12/2010 | Leviathan Advisors Limited | Cyprus | $32,500 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $11,500 |
| | 2/7/2011 | Global Highway Limited | Cyprus | $24,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $43,600 |
| | 3/28/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 4/27/2011 | Leviathan Advisors Limited | Cyprus | $3,000 |
| | 6/30/2011 | Global Highway Limited | Cyprus | $24,500 |
| | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $26,700 |
| | 12/12/2011 | Leviathan Advisors Limited | Cyprus | $46,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,800 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 2/28/2012 | Global Highway Limited | Cyprus | $16,000 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $8,000 |
| | 4/18/2012 | Lucicle Consultants Limited | Cyprus | $48,550 |
| | 5/15/2012 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $21,600 |
| | 8/7/2012 | Lucicle Consultants Limited | Cyprus | $15,500 |
| | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $10,900 |
| | 12/20/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | 1/15/2013 | Lucicle Consultants Limited | Cyprus | $37,000 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $7,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $39,000 |
| | 9/3/2013 | Global Endeavour Inc. | Grenadines | $81,500 |
| | 10/15/2013 | Global Endeavour Inc. | Grenadines | $53,000 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $13,200 |
| | 4/24/2014 | Global Endeavour Inc. | *Unknown* | $26,680 |
| | 9/11/2014 | Global Endeavour Inc. | Grenadines | $58,435 |
| | | | **Vendor E Total** | **$849,215** |
| **Vendor F** (Landscaper in the Hamptons, New York) | 4/27/2009 | Yiakora Ventures Limited | Cyprus | $34,000 |
| | 5/12/2009 | Yiakora Ventures Limited | Cyprus | $45,700 |
| | 6/1/2009 | Yiakora Ventures Limited | Cyprus | $21,500 |
| | 6/18/2009 | Yiakora Ventures Limited | Cyprus | $29,000 |
| | 9/21/2009 | Yiakora Ventures Limited | Cyprus | $21,800 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $44,000 |
| | 6/28/2010 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 7/23/2010 | Leviathan Advisors Limited | Cyprus | $19,000 |
| | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $21,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $57,700 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $26,000 |
| | 12/16/2010 | Global Highway Limited | Cyprus | $20,000 |
| | 3/22/2011 | Leviathan Advisors Limited | Cyprus | $50,000 |
| | 5/3/2011 | Global Highway Limited | Cyprus | $40,000 |
| | 6/1/2011 | Leviathan Advisors Limited | Cyprus | $44,000 |
| | 7/27/2011 | Leviathan Advisors Limited | Cyprus | $27,000 |
| | 8/16/2011 | Leviathan Advisors Limited | Cyprus | $13,450 |
| | 9/19/2011 | Leviathan Advisors Limited | Cyprus | $12,000 |
| | 10/24/2011 | Global Highway Limited | Cyprus | $42,000 |
| | 11/2/2011 | Global Highway Limited | Cyprus | $37,350 |
| | | | **Vendor F Total** | **$655,500** |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| Vendor G (Antique Dealer in New York) | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $165,000 |
| | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $165,000 |
| | 2/28/2012 | Global Highway Limited | Cyprus | $190,600 |
| | 3/14/2012 | Lucicle Consultants Limited | Cyprus | $75,000 |
| | 2/26/2013 | Lucicle Consultants Limited | Cyprus | $28,310 |
| | | | Vendor G Total | $623,910 |
| Vendor H (Clothing Store in Beverly Hills, California) | 6/25/2008 | LOAV Advisors Limited | Cyprus | $52,000 |
| | 12/16/2008 | Yiakora Ventures Limited | Cyprus | $49,000 |
| | 12/22/2008 | Yiakora Ventures Limited | Cyprus | $10,260 |
| | 8/12/2009 | Yiakora Ventures Limited | Cyprus | $76,400 |
| | 5/11/2010 | Global Highway Limited | Cyprus | $85,000 |
| | 11/17/2010 | Global Highway Limited | Cyprus | $128,280 |
| | 5/31/2011 | Leviathan Advisors Limited | Cyprus | $64,000 |
| | 11/15/2011 | Global Highway Limited | Cyprus | $48,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $7,500 |
| | | | Vendor H Total | $520,440 |
| Vendor I (Investment Company) | 9/3/2013 | Global Endeavour Inc. | Grenadines | $500,000 |
| | | | Vendor I Total | $500,000 |
| Vendor J (Contractor in Florida) | 11/15/2011 | Global Highway Limited | Cyprus | $8,000 |
| | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $11,237 |
| | 12/21/2011 | Black Sea View Limited | Cyprus | $20,000 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $51,000 |
| | 5/17/2012 | Lucicle Consultants Limited | Cyprus | $68,000 |
| | 6/19/2012 | Lucicle Consultants Limited | Cyprus | $60,000 |
| | 7/18/2012 | Lucicle Consultants Limited | Cyprus | $32,250 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $112,000 |
| | 11/30/2012 | Lucicle Consultants Limited | Cyprus | $39,700 |
| | 1/9/2013 | Lucicle Consultants Limited | Cyprus | $25,600 |
| | 2/28/2013 | Lucicle Consultants Limited | Cyprus | $4,700 |
| | | | Vendor J Total | $432,487 |
| Vendor K (Landscaper in the Hamptons, New York) | 12/5/2011 | Leviathan Advisors Limited | Cyprus | $4,115 |
| | 3/1/2012 | Global Highway Limited | Cyprus | $50,000 |
| | 6/6/2012 | Lucicle Consultants Limited | Cyprus | $47,800 |
| | 6/25/2012 | Lucicle Consultants Limited | Cyprus | $17,900 |
| | 6/27/2012 | Lucicle Consultants Limited | Cyprus | $18,900 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $3,300 |
| | 7/15/2013 | Pompolo Limited | United Kingdom | $13,325 |
| | 11/26/2013 | Global Endeavour Inc. | Grenadines | $9,400 |
| | | | **Vendor K Total** | **$164,740** |
| Vendor L (Payments Relating to three Range Rovers) | 4/12/2012 | Lucicle Consultants Limited | Cyprus | $83,525 |
| | 5/2/2012 | Lucicle Consultants Limited | Cyprus | $12,525 |
| | 6/29/2012 | Lucicle Consultants Limited | Cyprus | $67,655 |
| | | | **Vendor L Total** | **$163,705** |
| Vendor M (Contractor in Virginia) | 11/20/2012 | Lucicle Consultants Limited | Cyprus | $45,000 |
| | 12/7/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 12/17/2012 | Lucicle Consultants Limited | Cyprus | $21,000 |
| | 1/17/2013 | Lucicle Consultants Limited | Cyprus | $18,750 |
| | 1/29/2013 | Lucicle Consultants Limited | Cyprus | $9,400 |
| | 2/12/2013 | Lucicle Consultants Limited | Cyprus | $10,500 |
| | | | **Vendor M Total** | **$125,650** |
| Vendor N (Audio, Video, and Control System Home Integration and Installation Company in the Hamptons, New York) | 1/29/2009 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 3/17/2009 | Yiakora Ventures Limited | Cyprus | $21,725 |
| | 4/16/2009 | Yiakora Ventures Limited | Cyprus | $24,650 |
| | 12/2/2009 | Global Highway Limited | Cyprus | $10,000 |
| | 3/8/2010 | Global Highway Limited | Cyprus | $20,300 |
| | 4/23/2010 | Yiakora Ventures Limited | Cyprus | $8,500 |
| | 7/29/2010 | Leviathan Advisors Limited | Cyprus | $17,650 |
| | | | **Vendor N Total** | **$112,825** |
| Vendor O (Purchase of Mercedes Benz) | 10/5/2012 | Lucicle Consultants Limited | Cyprus | $62,750 |
| | | | **Vendor O Total** | **$62,750** |
| Vendor P (Purchase of Range Rover) | 12/30/2008 | Yiakora Ventures Limited | Cyprus | $47,000 |
| | | | **Vendor P Total** | **$47,000** |
| Vendor Q | 9/2/2010 | Yiakora Ventures Limited | Cyprus | $10,000 |
| | 10/6/2010 | Global Highway Limited | Cyprus | $10,000 |

| Payee | Transaction Date | Originating Account Holder | Country of Origination | Amount of Transaction |
|---|---|---|---|---|
| (Property Management Company in South Carolina) | 10/18/2010 | Leviathan Advisors Limited | Cyprus | $10,000 |
| | 2/8/2011 | Global Highway Limited | Cyprus | $13,500 |
| | 2/9/2012 | Global Highway Limited | Cyprus | $2,500 |
| | | | **Vendor Q Total** | **$46,000** |
| **Vendor R** (Art Gallery in Florida) | 2/9/2011 | Global Highway Limited | Cyprus | $17,900 |
| | 2/14/2013 | Lucicle Consultants Limited | Cyprus | $14,000 |
| | | | **Vendor R Total** | **$31,900** |
| **Vendor S** (Housekeeping in New York) | 9/26/2011 | Leviathan Advisors Limited | Cyprus | $5,000 |
| | 9/19/2012 | Lucicle Consultants Limited | Cyprus | $5,000 |
| | 10/9/2013 | Global Endeavour Inc. | Grenadines | $10,000 |
| | | | **Vendor S Total** | **$20,000** |

17.     In 2012, MANAFORT caused the following wires to be sent to the entities listed below to purchase the real estate also listed below.  MANAFORT did not report the money used to make these purchases on his 2012 tax return.

| Property Purchased | Payee | Date | Originating Account | Country of Origin | Amount |
|---|---|---|---|---|---|
| Howard Street Condominium (New York) | DMP International LLC | 2/1/2012 | Peranova Holdings Limited | Cyprus | $1,500,000 |
| Union Street Brownstone, (New York) | Attorney Account Of [Real Estate Attorney] | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,800,000 |
| | | 11/29/2012 | Actinet Trading Limited | Cyprus | $1,200,000 |
| Arlington House (Virginia) | Real Estate Trust | 8/31/2012 | Lucicle Consultants Limited | Cyprus | $1,900,000 |

MANAFORT And GATES' Hiding Of Ukraine Lobbying And Public Relations Work

18.     It is illegal to act as an agent of a foreign principal engaged in certain United States influence

activities without registering the affiliation.   Specifically, a person who engages in lobbying or

public relations work in the United States (hereafter collectively referred to as lobbying) for a

foreign principal such as the Government of Ukraine or the Party of Regions is required to provide

a detailed written registration statement to the United States Department of Justice.   The filing,

made under oath, must disclose the name of the foreign principal, the financial payments to the

lobbyist, and the measures undertaken for the foreign principal, among other information.   A

person required to make such a filing must further make in all lobbying material a "conspicuous

statement" that the materials are distributed on behalf of the foreign principal, among other things.

The filing thus permits public awareness and evaluation of the activities of a lobbyist who acts as

an agent of a foreign power or foreign political party in the United States.

19.     In furtherance of the scheme, from 2006 until 2014, both dates being approximate and

inclusive, MANAFORT and GATES engaged in a multi-million dollar lobbying campaign in the

United States at the direction of Yanukovych, the Party of Regions, and the Government of

Ukraine.   MANAFORT and GATES did so without registering and providing the disclosures

required by law.

20.     As part of the scheme, in February 2012, MANAFORT and GATES solicited two

Washington, D.C., firms (Company A and Company B) to lobby in the United States on behalf of

Yanukovych, the Party of Regions, and the Government of Ukraine.   For instance, GATES wrote

to Company A that it would be "representing the Government of Ukraine in [Washington,] DC."

21.     MANAFORT repeatedly communicated in person and in writing with Yanukovych, and

GATES passed on directions to Company A and Company B.  For instance, MANAFORT wrote Yanukovych a memorandum dated April 8, 2012, in which he provided Yanukovych an update on the lobbying firms' activities "since the inception of the project a few weeks ago.  It is my intention to provide you with a weekly update moving forward."  Toward the end of that first year, in November 2012, GATES wrote to Company A and Company B that the firms needed to prepare an assessment of their past and prospective lobbying efforts so the "President" could be briefed by "Paul" "on what Ukraine has done well and what it can do better as we move into 2013."

22.    At the direction of MANAFORT and GATES, Company A and Company B engaged in extensive lobbying.   Among other things, they lobbied multiple Members of Congress and their staffs about Ukraine sanctions, the validity of Ukraine elections, and the propriety of Yanukovych's imprisoning his presidential rival, Yulia Tymoshenko (who had served as Ukraine President prior to Yanukovych).  MANAFORT and GATES also lobbied in connection with the roll out of a report concerning the Tymoshenko trial commissioned by the Government of Ukraine. MANAFORT and GATES used one of their offshore accounts to funnel $4 million to pay secretly for the report.

23.    To minimize public disclosure of their lobbying campaign, MANAFORT and GATES arranged for the Centre to be the nominal client of Company A and Company B, even though in fact the Centre was under the ultimate direction of the Government of Ukraine, Yanukovych, and the Party of Regions.  For instance, MANAFORT and GATES selected Company A and Company B, and only thereafter did the Centre sign contracts with the lobbying firms without ever meeting either company.  Company A and Company B were paid for their services not by their nominal client, the Centre, but solely through off-shore accounts associated with the MANAFORT-GATES entities, namely Bletilla Ventures Limited (in Cyprus) and Jeunet Ltd. and Global Endeavour Inc.

(in Grenadines). In total, Company A and Company B were paid more than $2 million from these accounts between 2012 and 2014.

24.     To conceal the scheme, MANAFORT and GATES developed a false and misleading cover story that would distance themselves and the Government of Ukraine, Yanukovych, and the Party of Regions from the Centre, Company A, and Company B. For instance, in the wake of extensive press reports on MANAFORT and his connections with Ukraine, on August 16, 2016, GATES communicated false talking points to Company B in writing, including:

- Q: "Can you describe your initial contact with [Company B] and the lobbying goals he discussed with them?" A: "We provided an introduction between the [Centre] and [Company B/Company A] in 2012. The [Centre] was seeking to retain representation in Washington, DC to support the mission of the NGO."

- A: "Our [MANAFORT and GATES'] task was to assist the [Centre] find representation in Washington, but at no time did our firm or members provide any direct lobbying support."

- A: "The structure of the arrangement between the [Centre] and [Company A and Company B] was worked out by the two parties."

- Q: "Can you say where the funding from for [sic] the [Centre] came from? (this amounted to well over a million dollars between 2012 and 2014)." A: "This is a question better asked of the [Centre] who contracted with the two firms."

- Q: "Can you describe the lobbying work specifically undertaken by [Company B] on behalf of the Party of Regions/the [Centre]?" A: "This is a question better asked to Company B and/or the [Centre] as the agreement was between the parties. Our firm did not play a role in the structure, nor were we registered lobbyists."

Company B through a principal replied to GATES the same day that "there's a lot of email traffic that has you much more involved than this suggests[.] We will not disclose that but heaven knows what former employees of [Company B] or [Company A] might say."

25.    In September 2016, after numerous recent press reports concerning MANAFORT, the Department of Justice informed MANAFORT, GATES, and DMI that it sought to determine whether they had acted as agents of a foreign principal under the Foreign Agents Registration Act (FARA), without registering.  In November 2016 and February 2017, MANAFORT, GATES, and DMI caused false and misleading letters to be submitted to the Department of Justice, which mirrored the false cover story set out above.  The letters, both of which were approved by MANAFORT and GATES before they were submitted, represented, among other things, that:

- DMI's "efforts on behalf of the Party of Regions" "did not include meetings or outreach within the U.S.";

- MANAFORT and GATES did not "recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [Centre], nor do they recall being party to, arranging, or facilitating any such communications.  Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre's] U.S. consultants, as directed by the [Centre]. . . .";

- MANAFORT and GATES had merely served as a means of introduction of Company A and Company B to the Centre and provided the Centre with a list of "potential U.S.-based consultants—including [Company A] and [Company B]—for the [Centre's] reference and further consideration."

- DMI "does not retain communications beyond thirty days" and as a result of

18

this policy, a "search has returned no responsive documents." The November 2016 letter attached a one-page, undated document that purported to be a DMI "Email Retention Policy."

26.     In fact, MANAFORT and GATES had: selected Company A and Company B; engaged in weekly scheduled calls and frequent emails with Company A and Company B to provide them directions as to specific lobbying steps that should be taken; sought and received detailed oral and written reports from these firms on the lobbying work they had performed; communicated with Yanukovych to brief him on their lobbying efforts; both congratulated and reprimanded Company A and Company B on their lobbying work; communicated directly with United States officials in connection with this work; and paid the lobbying firms over $2 million from offshore accounts they controlled, among other things. In addition, court-authorized searches of MANAFORT and GATES' DMI email accounts and MANAFORT's Virginia residence in July 2017 revealed numerous documents, including documents related to lobbying, which were more than thirty-days old at the time of the November 2016 letter to the Department of Justice.


MANAFORT And GATES' Hiding Of Foreign Bank Accounts And False Filings

27.     United States citizens who have authority over certain foreign bank accounts -- whether or not the accounts are set up in the names of nominees who act for their principals -- have reporting obligations to the United States.

28.     First, the Bank Secrecy Act and its implementing regulations require United States citizens to report to the United States Treasury any financial interest in, or signatory authority over, any bank account or other financial account held in foreign countries, for every calendar year in which the aggregate balance of all such foreign accounts exceeds $10,000 at any point during the year.

This is commonly known as a foreign bank account report or "FBAR." The Bank Secrecy Act requires these reports because they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. The United States Treasury's Financial Crimes Enforcement Network (FinCEN) is the custodian for FBAR filings, and FinCEN provides access to its FBAR database to law enforcement entities, including the Federal Bureau of Investigation. The reports filed by individuals and businesses are used by law enforcement to identify, detect, and deter money laundering that furthers criminal enterprise activity, tax evasion, and other unlawful activities.

29.     Second, United States citizens also are obligated to report information to the IRS regarding foreign bank accounts. For instance, in 2010 Form 1040, Schedule B had a "Yes" or "No" box to record an answer to the question: "At any time during [the calendar year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?" If the answer was "Yes," then the form required the taxpayer to enter the name of the foreign country in which the financial account was located.

30.     For each year in or about and between 2008 through at least 2014, MANAFORT had authority over foreign accounts that required an FBAR report. Specifically, MANAFORT was required to report to the United States Treasury each foreign bank account held by the foreign MANAFORT-GATES entities noted above in paragraph 12 that bear the initials PM. No FBAR reports were made by MANAFORT for these accounts.

31.     For each year in or about and between 2008 through at least 2013, GATES had authority over foreign accounts that required an FBAR report. Specifically, GATES was required to report to the United States Treasury each foreign bank account held by the foreign MANAFORT-GATES

entities noted above in paragraph 12 that bear the initials RG, as well as three other accounts in the United Kingdom. No FBAR reports were made by GATES for these accounts.

32.     Furthermore, in each of MANAFORT's tax filings for 2008 through 2014, MANAFORT represented falsely that he did not have authority over any foreign bank accounts. MANAFORT and GATES had repeatedly and falsely represented in writing to MANAFORT's tax preparer that MANAFORT had no authority over foreign bank accounts, knowing that such false representations would result in false MANAFORT tax filings. For instance, on October 4, 2011, MANAFORT's tax preparer asked MANAFORT in writing: "At any time during 2010, did you [or your wife or children] have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?" On the same day, MANAFORT falsely responded "NO." MANAFORT responded the same way as recently as October 3, 2016, when MANAFORT's tax preparer again emailed the question in connection with the preparation of MANAFORT's tax returns: "Foreign bank accounts etc.?" MANAFORT responded on or about the same day: "NONE."

MANAFORT And GATES' Fraud To Increase Access To Offshore Money

33.     After MANAFORT used his offshore accounts to purchase real estate in the United States, he took out mortgages on the properties thereby allowing MANAFORT to have the benefits of liquid income without paying taxes on it. Further, MANAFORT defrauded the banks that loaned him the money so that he could withdraw more money at a cheaper rate than he otherwise would have been permitted.

34.     In 2012, MANAFORT, through a corporate vehicle called "MC Soho Holdings, LLC" owned by him and his family, bought a condominium on Howard Street in the Soho neighborhood

in Manhattan, New York. He paid approximately $2,850,000. All the money used to purchase the condominium came from MANAFORT entities in Cyprus. MANAFORT used the property from at least January 2015 through 2016 as an income-generating rental property, charging thousands of dollars a week on Airbnb, among other places. In his tax returns, MANAFORT took advantage of the beneficial tax consequences of owning this rental property.

35.     In late 2015 through early 2016, MANAFORT applied for a mortgage on the condominium. Because the bank would permit a greater loan amount if the property were owner-occupied, MANAFORT falsely represented to the bank and its agents that it was a secondary home used as such by his daughter and son-in-law and was not a property held as a rental property. For instance, on January 26, 2016, MANAFORT wrote to his son-in-law to advise him that when the bank appraiser came to assess the condominium his son-in-law should "[r]emember, he believes that you and [MANAFORT's daughter] are living there." Based on a request from MANAFORT, GATES caused a document to be created which listed the Howard Street property as the second home of MANAFORT's daughter and son-in-law, when GATES knew this fact to be false. As a result of his false representations, in March 2016 the bank provided MANAFORT a loan for approximately $3,185,000.

36.     Also in 2012, MANAFORT -- through a corporate vehicle called "MC Brooklyn Holdings, LLC" similarly owned by him and his family -- bought a brownstone on Union Street in the Carroll Gardens section of Brooklyn, New York. He paid approximately $3,000,000 in cash for the property. All of that money came from a MANAFORT entity in Cyprus. After purchase of the property, MANAFORT began renovations to transform it from a multi-family dwelling into a single family home. In late 2015 through early 2016, MANAFORT sought to borrow cash against the property. The institution MANAFORT went to for the loan provided greater loan amounts for

22

"construction loans" -- that is, loans that required the loan amounts to be used to pay solely for construction of the property and thus increase the value of the property serving as the loan's collateral.   The institution would thus loan money against the expected completed value of the property, which in the case of the Union Street property was estimated to be $8,000,000.  In early 2016, MANAFORT was able to obtain a loan of approximately $5,000,000, after promising the bank that approximately $1,400,000 of the loan would be used solely for construction of the Union Street property.   However, MANAFORT never intended to limit use of the proceeds to construction as required by the loan contracts.  In December 2015, before the loan was made, MANAFORT wrote his tax preparer, among others, that the construction loan "will allow me to pay back the [another Manafort apartment] mortgage in full. . . ." Further, when the construction loan closed, MANAFORT used hundreds of thousands of dollars from the construction loan to make a down payment on another property in California.

### Statutory Allegations

### COUNT ONE
### (Conspiracy Against The United States)

37.   Paragraphs 1 through 30 and 32 through 36 are incorporated here.

38.   From in or about and between 2006 and 2017, both dates being approximate and inclusive, in the District of Columbia and elsewhere, the defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III, together with others,  knowingly and intentionally conspired to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of a government agency, namely the Department of Justice and the Department of the Treasury, and to commit offenses against the United States, to wit, the violations of law charged

in Counts Three through Six and Ten through Twelve.

39.    In furtherance of the conspiracy and to effect its illegal object, MANAFORT and GATES

committed the overt acts noted in Count Eleven and the overt acts, among others, in the District of

Columbia and elsewhere as set forth in paragraphs 9, 16, 17, 20-25, 32, and 34-36, which are

incorporated herein.

(18 U.S.C. § 371)

### COUNT TWO
### (Conspiracy To Launder Money)

40.    Paragraphs 1 through 30 and 32 through 36 are incorporated here.

41.    In or around and between 2006 and 2016, both dates being approximate and inclusive,

within the District of Columbia and elsewhere, the defendants PAUL J. MANAFORT, JR., and

RICHARD W. GATES III, together with others, did knowingly and intentionally conspire to:

(a) transport, transmit, and transfer monetary instruments and funds from places outside

the United States to and through places in the United States and from places in the United

States to and through places outside the United States, with the intent to promote the

carrying on of specified unlawful activity, to wit: a felony violation of the FARA, in

violation of Title 22, United States Code, Sections 612 and 618 (the "Specified Unlawful

Activity"), contrary to Title 18, United States Code, Section 1956(a)(2)(A); and

(b) conduct financial transactions, affecting interstate and foreign commerce, knowing that

the property involved in the financial transactions would represent the proceeds of some

form of unlawful activity, and the transactions in fact would involve the proceeds of

Specified Unlawful Activity, knowing that such financial transactions were designed in

whole and in part (i) to engage in conduct constituting a violation of sections 7201 and

7206 of the Internal Revenue Code of 1986, and (ii) to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the Specified Unlawful Activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(ii) and 1956(a)(1)(B)(i).

(18 U.S.C. § 1956(h))

### COUNTS THREE THROUGH SIX
(Failure To File Reports Of Foreign Bank And Financial
Accounts For Calendar Years 2011-2014)

42.     Paragraphs 1 through 30 and 32 through 36 are incorporated here.

43.     On the filing due dates listed below, in the District of Columbia and elsewhere, the defendant PAUL J. MANAFORT, JR., unlawfully, willfully, and knowingly did fail to file with the Department of the Treasury an FBAR disclosing that he has a financial interest in, and signature and other authority over, a bank, securities, and other financial account in a foreign country, which had an aggregate value of more than $10,000, while violating another law of the United States and as part of pattern of illegal activity involving more than $100,000 in a 12-month period, during the years listed below:

| COUNT | YEAR | DUE DATE TO FILE FBAR |
|-------|------|-----------------------|
| 3     | 2011 | June 29, 2012         |
| 4     | 2012 | June 30, 2013         |
| 5     | 2013 | June 30, 2014         |
| 6     | 2014 | June 30, 2015         |

(31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2)

## COUNTS SEVEN THROUGH NINE
(Failure To File Reports Of Foreign Bank And Financial
Accounts For Calendar Years 2011-2013)

44.     Paragraphs 1 through 29 and 31 through 36 are incorporated here.

45.     On the filing due dates listed below, in the District of Columbia and elsewhere, the

defendant RICHARD W. GATES III unlawfully, willfully, and knowingly did fail to file with the

Department of the Treasury an FBAR disclosing that he has a financial interest in, and signature

and other authority over, a bank, securities, and other financial account in a foreign country, which

had an aggregate value of more than $10,000, while violating another law of the United States and

as part of pattern of illegal activity involving more than $100,000 in a 12-month period, during the

years listed below:

| COUNT | YEAR | DUE DATE TO FILE FBAR |
|-------|------|------------------------|
| 7     | 2011 | June 29, 2012          |
| 8     | 2012 | June 30, 2013          |
| 9     | 2013 | June 30, 2014          |

(31 U.S.C. §§ 5314 and 5322(b); 18 U.S.C. § 2)

## COUNT TEN
(Unregistered Agent Of A Foreign Principal)

46.     Paragraphs 1 through 36 are incorporated here.

47.     From in or about and between 2008 and 2014, both dates being approximate and inclusive,

within the District of Columbia and elsewhere, the defendants PAUL J. MANAFORT, JR., and

RICHARD W. GATES III knowingly and willfully, without registering with the Attorney General

as required by law, acted as agents of a foreign principal, to wit, the Government of Ukraine, the

26

Party of Regions, and Yanukovych.

(22 U.S.C. §§ 612 and 618(a)(1); 18 U.S.C. § 2)

**COUNT ELEVEN**
**(False and Misleading FARA Statements)**

48.    Paragraphs 1 through 36 are incorporated here.

49.    On or about November 23, 2016 and February 10, 2017, within the District of Columbia and elsewhere, the defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III knowingly and willfully caused to be made a false statement of a material fact, and omitted a material fact necessary to make the statements therein not misleading, in a document filed with and furnished to the Attorney General under the provisions of FARA, to wit the underlined statements:

- "[DMI]'s efforts on behalf of the Party of Regions and Opposition Bloc did not include meetings or outreach within the U.S."

- "[N]either [DMI] nor Messrs. Manafort or Gates had any agreement with the [Centre] to provide services."

- "[DMI] did provide the [Centre], at the request of members of the Party of Regions, with a list of potential U.S.-based consultants—including [Company A and Company B]—for the [Centre]'s reference and further consideration. [The Centre] then contracted directly with [Company A and Company B] to provide services within the United States for which these entities registered under the Lobbying Disclosure Act."

- "To Gates' recollection, these efforts included providing policy briefings to the [Centre] and its consultants on key initiatives and political developments in

27

Ukraine, including participation in and/or coordination of related conference calls and meetings. Although Gates recalls interacting with [the Centre]'s consultants regarding efforts in the Ukraine and Europe, neither Gates nor Mr. Manafort recall meeting with or conducting outreach to U.S. government officials or U.S. media outlets on behalf of the [the Centre], nor do they recall being party to, arranging, or facilitating any such communications. Rather, it is the recollection and understanding of Messrs. Gates and Manafort that such communications would have been facilitated and conducted by the [Centre]'s U.S. consultants, as directed by the [Centre], pursuant to the agreement reached between those parties (to which [DMI] was not a party)."

- "[A] search has been conducted for correspondence containing additional information related to the matters described in [the government's] Letters. However, as a result of [DMI's] Email Retention Policy, which does not retain communications beyond thirty days, the search has returned no responsive communications."

(22 U.S.C. §§ 612, 618(a)(2); 18 U.S.C. § 2)

## COUNT TWELVE
### (False Statements)

50.    Paragraphs 1 through 36 and paragraph 49 are incorporated here.

51.    On or about November 23, 2016 and February 10, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, the defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III

knowingly and willfully did cause another: to falsify, conceal, and cover up by a scheme and device a material fact; to make a materially false, fictitious, and fraudulent statement and representation; and to make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement, to wit, the statements in the November 23, 2016 and February 10, 2017 submissions to the Department of Justice quoted in paragraph 49.

(18 U.S.C. §§ 2, 1001(a))

## **FORFEITURE ALLEGATION**

52.     Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1) and (a)(2), and Title 28, United States Code, Section 2461(c), in the event of the defendants' convictions under Count Two of this Indictment. Upon conviction of the offense charged in Count Two, the defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property. Upon conviction of the offenses charged in Counts Ten and Eleven, the defendants PAUL J. MANAFORT, JR., and RICHARD W. GATES III shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s) of conviction. Notice is further given that, upon conviction, the United States intends to seek a judgment against each defendant for a sum of money representing the property described in this paragraph, as applicable to each defendant (to be offset by the forfeiture of any specific property),

53.     The grand jury finds probable cause to believe that the property subject to forfeiture by PAUL J. MANAFORT, JR., includes, but is not limited to, the following listed assets:

a.      The real property and premises commonly known as 377 Union Street, Brooklyn, New York, 11231 (Block 429, Lot 65), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

b.      The real property and premises commonly known as 29 Howard Street, #4D, New York, New York, 10013 (Block 209, Lot 1104), including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

c.      The real property and premises commonly known as 1046 N. Edgewood Street, Arlington, Virginia, 22201, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto;

d.      The real property and premises commonly known as 174 Jobs Lane, Water Mill, New York 11976, including all appurtenances, improvements, and attachments thereon, and any property traceable thereto; and

e.      Northwestern Mutual Universal Life Insurance Policy 18268327.

## Substitute Assets

54.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of any defendant --

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853, to seek forfeiture of any other property of said defendant.

(18 U.S.C. §§ 981(a)(1)(C) and 982; 28 U.S.C. § 2461(c))

Robert S. Mueller, III
Special Counsel
Department of Justice

A TRUE BILL;

Foreperson

Date: October 27, 2017

31